**PAN AMERICAN WORLD AIRWAYS, INC., Plaintiff,**

v.

**PANAMERICAN SCHOOL OF TRAVEL, INC. and Pan American Travel News, Inc., Defendants.**

**No. 85 Civ. 0502 (LLS).**

United States District Court, S.D. New York.

May 5, 1986.

Brumbaugh, Graves, Donohue & Raymond, New York, N.Y., for plaintiff; Joseph D. Garon, Doreen J. Leavens, of counsel.

Underweiser & Underweiser, Jay H. Landau, of counsel, and Kenyon & Kenyon, New York, N.Y., Jonathan D. Reichman, of counsel, for defendants.

## OPINION

STANTON, District Judge.

This case concerns defendant's right to use the word "Panamerican" in advertising and promoting its School of Travel, which trains prospective travel agents and airline ticketing or reservations clerks. Plaintiff claims that use infringes the marks and identity it has established as Pan American World Airways, Inc.

### Background

For ten years following its organization in 1972, defendant used the name "Escuela Panamerican de Viajes" for its travel school, and its customers and students were exclusively Spanish-speaking individuals. It advertised in La Prensa, El Diario and on local Spanish-speaking radio and TV stations. Until about 1975 defendant also

did business as a travel agency. It was known to plaintiff, for it dealt with plaintiff's sales agents (one of whom was a part-time teacher at defendant's school) and it received a plaque in 1973 for being one of plaintiff's top producers of passenger business. When defendant stopped operating as a travel agency, plaintiff's sales agents encouraged it to continue as a school, saying that there was no other travel school serving the Spanish-speaking community.

In 1982 defendant offered its courses to English-speaking students, translated its name to Panamerican School of Travel, and started using a logo consisting of a globe crossed by the representation of an airplane in connection with its advertising and promotion, which it broadened to include the New York Post, the New York Daily News and subway posters.

Defendant was familiar at that time with plaintiff and plaintiff's use of a globe logo in connection with its mark "Pan Am". Defendant's globe design was independently developed by a third-party graphic artist, who told defendant it was "different" from plaintiff's logo. Although defendant did not instruct the artist to imitate or take advantage of plaintiff's design, neither did it conduct a trademark search or obtain an opinion of counsel as to the availability of the name "Panamerican" or the globe logo.

In September 1984, the Bankruptcy Court (defendant was then in a Chapter 11 bankruptcy proceeding but has apparently emerged) ordered defendant to cease use of the globe and airplane logo. Mr. Juan Martinez, owner of defendant, testified that upon issuance of the order he immediately began to obliterate the globe design from course materials with a felt tip marker, but defendant apparently continued to use course materials and business stationery, bills and checks that displayed the globe until its supplies were depleted, and thus did not actually stop all use of the globe logo until July 1985, almost a year after the order to cease was issued.

Although defendant does not now use the globe and airplane logo in connection with its mark, plaintiff contends that defendant's use of the word "Panamerican" as part of its trade name infringes on plaintiff's well established marks, "Pan Am", "Pan American" and "Pan American World Airways, Inc.", resulting in public confusion about the source or sponsorship of defendant's services.

Since as early as April 1931 and continuing to the present, plaintiff has used the trade names "Pan Am", "Pan American" and "Pan American World Airways". Since October, 1956, plaintiff has used the mark "Pan Am" plus its globe logo design. Plaintiff has duly registered its marks "Pan Am" and "Pan Am" plus the globe logo. Defendant does not challenge plaintiff's ownership and exclusive rights to the use of these registered marks; nor does it challenge plaintiff's common law trademark rights in "Pan American World Airways". Rather, the case centers on plaintiff's trademark rights in the words "Pan American" in connection with its airline and travel related services.[1]

Plaintiff alleges that until the late 1960's, its primary corporate identification was "Pan American". In the early 1970's, plaintiff adopted as its primary mark the nickname "Pan Am". Plaintiff contends that it continues to use the names "Pan American" and "Pan American World Airways", and that the public has not disassociated the term "Pan American" from plaintiff. Plaintiff points to its display of the words "Pan American" at its Rockefeller Center "flagship" location and at its ticket counter at the Pan Am building, visible to the crowds travelling Grand Central Station.

Although plaintiff is primarily known for its airline and transportation services, it also offers a training program for travel agents. It presently offers seven courses, ranging from entry level courses, for which no prior education or training is necessary,

---

**1.** If defendant's use of Panamerican School of Travel does not infringe plaintiffs use of "Pan American", it does not infringe "Pan American World Airways" or "Pan Am."

to courses designed for owners and managers of travel agencies. Although any applicant, whether or not employed by a travel agency or airline, may be eligible to take plaintiff's training courses, plaintiff's method of marketing its course tends to restrict it to employed travel agents, since it advertises the course by sending brochures to its field offices which distribute them to travel agencies. Moreover, plaintiff's training program operates at a loss: its primary goal is to generate bookings on Pan Am. Thus, plaintiff hopes primarily to be training employed travel agents who will "sell" Pan Am when they return to their jobs after training.

Plaintiff's Trade or Service Mark Rights

■ Although plaintiff does not have a registered trademark in the name "Pan American", and accordingly sues under Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), ownership of the exclusive right to use a mark is not dependent upon registration, but rather upon the use of the mark. *United Drug Co. v. Theodore Rectanus*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918); *Emerson Elec. Mfg. Co. v. Emerson Radio & Phonograph Corp.*, 105 F.2d 908 (2d Cir.1939). To establish ownership rights, the use must be deliberate and continuous. 3 Callman, Unfair Competition, Trademarks and Monopolies § 19.07 (1983); *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir.1974).

[T]he right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially.

Plaintiff demonstrated at trial many examples of its use of the term "Pan Am"; it also showed at least some use of "Pan American World Airways".[2] Its showing of continued use of the words "Pan American" as a mark, however, was sparse.

Specifically, plaintiff identified two ticket office signs that identify plaintiff as "Pan American",[3] one at its Fifth Avenue ticket office and one at its 45th Street ticket office in the Pan Am building. The sign in the Pan Am building is "inside the [ticket] office, looking in at the 45th Street entrance." Tr. 16. No picture of this sign was provided. Mr. Sheahan testified that the sign is visible from across the street from the ticket office on 45th Street. This sign, however, is one of many displayed at that ticket office location. The sign above the entrance of the ticket office in the Pan Am building lobby reads "Pan Am Ticket Office"; the signs in front of the ticket office on the outside of the building say "Pan Am"; a sign on the corner of 45th Street and Vanderbilt Avenue, under the arcade of the building reads "Pan Am"; and a large sign facing north and south on top of the building and illuminated at night reads "Pan Am". In fact, the building is commonly referred to by the public, as it has been here, as "the Pan Am building".

The sign reading "Pan American" at the 5th Avenue ticket office at Rockefeller Center has been there since at least 1967, i.e., before plaintiff changed its primary corporate identification to "Pan Am". It was not established that plaintiff ever significantly used the name "Pan American",

---

**2.** Plaintiff does not use the name "Pan American World Airways" to advertise or promote its services. Its primary mark for those purposes is clearly "Pan Am". Mr. Sheahan testified that plaintiff continues to use "Pan American World Airways" in tour brochures, schedules, the "Pan Am Clipper" magazine, business cards, letterheads, and its frequent mileage [sic] and world pass programs. The documents in evidence revealed, however, that at least with respect to the travel brochures and the magazine, plaintiff is most prominently referred to as "Pan Am" (on the cover and throughout the brochures and magazine); and plaintiff's world pass program is advertised as Pan Am's World Pass program. It appears that plaintiff's only actual use of its full name is when identifying itself for corporate purposes, such as on letterheads or occasionally in small print in part of a brochure.

**3.** Plaintiff also has one ticket office sign outside the Pan Am building reading "Pan American Airways Building". Exh. 57.

but to the extent that it did, this sign seems dated and not characteristic of plaintiff's present use of that mark.

Plaintiff provided little additional evidence that it uses the name or is referred to as "Pan American". It produced two commendation letters from satisfied students of its travel school in which the students refer to plaintiff by that name, and two travel brochures which identify plaintiff as "Pan American". In the brochures, however, the references are in small print on an inside page, and plaintiff is more prominently referred to on the cover and throughout the brochure as "Pan Am". Mr. Sheahan testified that an advertisement referred to plaintiff's world pass program as "Pan American World Pass" and that the pass is commonly known by that term, *see* tr. 24; however, the exhibit to which he referred in fact identifies the program as "Pan Am World Pass". Exh. 41.

It is clear that plaintiff has not demonstrated present "deliberate and continuous" use of the mark "Pan American". It appears equally clear that plaintiff cannot have acquired ownership rights in a name "that it has never formally utilized." *Continental Corrugated Container Corp. v. Continental Group, Inc.*, 462 F.Supp. 200, 204 (S.D.N.Y.1978) (where plaintiff concedes it has always used full corporate name, doubtful whether it could claim trademark right in "continental corrugated" standing alone). Plaintiff contends, however, that even if it does not currently use the name "Pan American", it did use that name as its primary corporate indicator for forty years and thus continues to enjoy actual and "residual" goodwill in the mark.

■ If the proponent of a mark stops using it but demonstrates an intent to keep the mark alive for use in resumed business, the mark retains "residual" goodwill and thus continues to enjoy trademark protection, as long as it retains its significance as an indication of the origin of the goods or services. *Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053 (2d Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). The reason is that the mark "represents the reputation developed by its owner for the nature and quality of goods or services sold by him", *id.* at 1059, and unless he abandons his mark, i.e., discontinues using it with the intent not to resume its use, others should be prohibited from using the mark to describe their own goods. *Ibid.*

■ That does not appear to be the situation here, for two reasons. First, there is insufficient evidence to establish that "Pan American" served "40 years as [plaintiff's] primary corporate indicator." (Plaintiff's Post-Trial Brief p. 4.) Mr. Sheahan testified at one point that "[w]e used [Pan American] during the late 1960's", tr. 8; and at another that prior to the time "Pan Am" became its primary identification, "[w]e had always been identified as Pan American World Airways or Pan Am", tr. 9. It is unclear when plaintiff claims it was identified as "Pan American". Moreover, the two ticket office signs, two commendation letters and two small-type references in travel brochures hardly establish identification of plaintiff by the public with the mark "Pan American".

Second, if, as plaintiff contends, it was once known as "Pan American", plaintiff has neither shown nor claimed any intent to resume the use of that name in connection with its services. Rather, plaintiff established that it went through an "evolutionary process" in the early 1970's to modernize the company's image, and adopted its nickname "Pan Am" as its primary corporate identification.

Since plaintiff has not established use of the words "Pan American" as a mark, either past or present, it cannot successfully claim it "continues to enjoy actual and 'residual' goodwill in the mark PAN AMERICAN". (Plaintiff's Post-Trial Brief p. 4.)

■ Plaintiff further asserts that based on the current use of "Pan Am", it retains actual goodwill in "Pan American". "The law permits a user who changes the *form* of its mark to retain the benefit of its use

of the earlier form, without abandonment, if the new and old forms create the same, continuing commercial impression." *Ilco Corp. v. Ideal Security Hardware Corp.,* 527 F.2d 1221, 1224 (C.C.P.A.1976). That is because whatever rights an individual possesses in his mark "reside in the term, rather than in any particular form or arrangement thereof." *Ibid,* citing *Humble Oil & Refining Co. v. Sekisui Chemical Co.,* 165 U.S.P.Q. 597, 603–4 (T.T.A.B.1970). The discussion above disposes of this argument as well. Since plaintiff has not established any rights in the mark "Pan American", it cannot, by changing the form, create rights in that name.

I find that plaintiff has failed to demonstrate sufficient use of the words "Pan American" to create ownership of an exclusive right to use them as a mark. It appears rather that "Pan Am" is short for "Pan American World Airways", *see* tr. 9. ("We had always been identified as Pan American World Airways or Pan Am, and the term Pan Am ha[d] been pretty consistently used by the company prior to that time"), and that plaintiff has never significantly used the name "Pan American" alone. However, the fact that plaintiff displays two ticket signs using that name and two students of its travel school identified plaintiff as "Pan American", albeit only slight evidence of use of the term, incline me not to rest the decision on that ground alone. For even if plaintiff established sufficient use of the words "Pan American", it still would not be entitled to prevent defendant from its use of its present name.

Protection Accorded Plaintiff's Use of the Words "Pan American"

■ Exclusive ownership rights in a trade name do not automatically entitle the owner to protection in an infringement action. Even given such rights, one must determine what level of protection, if any,

the mark should be accorded. The test is "likelihood of confusion": [4]

> Given a valid trademark, the critical issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of reasonable consumers would be misled, or simply confused, as to the source of the goods in question.

*C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 17 (2d Cir.1985); *see Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). In determining the likelihood of confusion, the appropriate analysis considers the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). These factors include the (1) strength of plaintiff's mark; (2) similarity between the marks; (3) proximity between the goods or services; (4) likelihood that plaintiff will bridge the gap; (5) actual confusion; (6) defendant's intent; (7) quality of defendant's services; and (8) sophistication of the buyers. *Id.,* at 495. "No single *Polaroid* factor is determinative. Rather each must be considered in the context of all of the other factors, and from a balance of these determinations, one is able to reach the ultimate conclusion, whether there is a likelihood of confusion between the two parties' products." *Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004 (2d Cir.1983). Further, there are additional considerations. *See Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d at 495. These include such equitable factors as the conflicting interests of the parties in continuing their trademark use, *see McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1140 (2d Cir.1979), and "the nature of the senior user's priority, the senior user's

---

**4.** While a claim under Section 43(a) seems to technically be a claim for unfair competition, 3A Callman, Unfair Competition Trademarks and Monopolies § 21.06, rather than a claim for infringement of a registered mark under § 32(1)(a) of the Act, 15 U.S.C. § 1114(1)(a), the terms "unfair competition" and "trademark in-

fringement" are sometimes used interchangeably in this circuit regarding § 43(a) claims, and the test and analysis for each are apparently the same, i.e., likelihood of confusion, involving examination of the *"Polaroid* factors." *See Thompson Medical Co., Inc. v. Pfizer Inc.,* 753 F.2d 208 (2d Cir.1985).

delay in asserting its claim, and the harm to the junior user as compared to the benefit to the senior user that would result from the requested injunction". *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 214 (2d Cir.1985), citing *Chandon Champagne Corp. v. San Marino Wire Corp.*, 335 F.2d 531, 536 (2d Cir.1964); *see generally, Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 378 (S.D.N.Y.1985).

(1) Strength of Plaintiff's Mark

■ The distinctiveness of a mark determines its strength or weakness. *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d at 1005. Callman, Unfair Competition, Tradenames and Monopolies, § 20.43 (3d ed. 1983). To determine distinctiveness, trademarks are ranked in four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *McGregor-Doniger Inc. v. Drizzle, Inc.*, 599 F.2d at 1131. A generic term "refers ... to the genus of which the particular product is a species" and is not entitled to legal protection or trademark registration. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). A descriptive mark is one which "forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Stix Products, Inc. v. United Merchants & Manufacturers Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968), *e.g.*, "World Book" for an encyclopedia, *see Field Enterprises Educational Corp. v. Cove Industries, Inc.*, 297 F.Supp. 989 (E.D.N.Y.1969). Descriptive marks, like generic ones, are considered inherently weak and may be protected or registered only upon a showing of "secondary meaning". *McGregor-Doniger Inc. v. Drizzle, Inc.*, 599 F.2d at 1131.

A suggestive mark has not been clearly defined, *see Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d at 10, but appears to be one that "require[s] imagination, thought and perception to reach a conclusion as to the nature of the goods", *Stix Products, Inv. v. United Merchants & Manufacturers Inc.*, 295 F. Supp. at 488, or one which only "indirectly" describes the goods or services at issue, *e.g.*, "Coppertone" for suntan oil, *see Douglas Laboratories Corp. v. Copper Tan, Inc.*, 210 F.2d 453 (2d Cir.), *cert. denied*, 347 U.S. 968, 74 S.Ct. 779, 98 L.Ed.2d 1109 (1954). An arbitrary or fanciful mark is a term having no association with the particular product or service. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d at 11; *e.g.*, "Kodak" for photographic equipment. Marks in these last two categories may be registered without proof of secondary meaning.

■ The mark "Pan American" best fits into the "suggestive" category. "Pan American" is not synonymous only with intercontinental air travel services; thus the mark does not directly identify the service provided and is not used in the generic sense. Nor is the name "merely descriptive" of plaintiff's services, *see id.* at 9, for one who heard the words "Pan American" would not be immediately "apprised of the nature of plaintiff's business." *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147, 156 (S.D.N.Y.1980). Nor is the term a word invented solely for use as a trademark or a common word applied in an unfamiliar way, so as to fit into the fanciful or arbitrary category. Rather, "Pan American" "is a common word applied in a manner that is not entirely commonplace, but not quite unfamiliar either." *Ibid.*

This conclusion, however, is not decisive in determining the mark's strength. The Second Circuit has stated that "while these categories can be useful for analytical purposes, the strength of a mark depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." *McGregor-Doniger Inc. v. Drizzle, Inc.*, 599 F.2d at 1131. The mark "Pan American" is simply not distinctive to plaintiff's services; it is a weak mark.

First, the mark is neither original nor unique. Although it is suggestive and not geographically descriptive of plaintiff's services, since those services span the globe and not just the Americas, it is a use of

words of our general vocabulary which others should be free to use to describe their products or services, absent a better showing by plaintiff that it is somehow distinctive to its services. *See Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 260 (5th Cir.1980) (although word "domino" is arbitrary as applied to plaintiff's product, it is a common word with dictionary meanings and thus it will not be accorded the same degree of protection as coined and fanciful terms, such as "Kodak").

Second, third-party use renders the mark weak. Defendant submitted telephone directory listings from both inside and outside New York of over 340 companies, both travel related and nontravel, that use the names "Pan American" or "Panamerican". Since defendant did not actually contact any of these companies, all the list proves is that telephone numbers were assigned to these names, *National Steel Products Co. v. Quonset Hut, Inc.,* 211 U.S.P.Q. 820, 823 (T.T.A.B.1981); *see also Scarves By Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1173 (2d Cir.1976) (the significance of third-party trademarks depends wholly upon their usage), but it illustrates that "Pan American" is a term regarded as available for use in connection with both travel related and nontravel services. *See Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d 251, 256–57 (2d Cir.1982) (although court had no information that five registered trademarks using same name were well promoted or recognized by customers, such registrations could be considered in drawing inference that mark's strength had been diluted by third-party use). Although the probative value of these telephone lists is limited, the ordinary meaning of the word *pan-american* cannot be ignored. "Trademark strength is 'an amorphous concept with little shape or substance when divorced from the mark's commercial context[.]' ... We see no advantage to be derived from barring judicial consideration of the realities that give content to the concept of trademark strength." *Id.* at 257, quoting *McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d at 1133.

■ Plaintiff can "fortify" its weak mark with a showing of secondary meaning. *Information Clearing House v. Find Magazine,* 492 F.Supp. at 157; *see McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d at 1132–33; *Inc. Publishing Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. at 378. Since plaintiff's mark is "suggestive", proof of secondary meaning is not necessary for registration or protection; "[h]owever, the absence of evidence of secondary meaning may be considered as a factor weighing against a finding of a likelihood of confusion." *Ibid.* Thus, a suggestive mark is "entitled to protection, regardless of proof of secondary meaning, *if* [plaintiff] could prove that confusion of origin was likely to result from the use of a similar mark on noncompeting goods." *McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d at 1132 (emphasis in original). The necessity of resorting to a showing of secondary meaning with a suggestive term "is an implicit confession that the mark was originally, and therefore still may be, purely descriptive, generic, geographical or otherwise nonregistrable." 3 Callman, Unfair Competition Trademarks and Monopolies § 1809, at 56.

■ To show secondary meaning, a plaintiff "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." *National Automobile Club v. National Auto Club, Inc.,* 365 F.Supp. 879, 884 (S.D.N.Y.1973), citing *Kellogg v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938). To determine if secondary meaning has been established, the court may properly consider the following factors, among others: advertising expenditures; consumer studies linking the name with plaintiff; sales success; and the length and exclusivity of the mark's use. *Thompson Medical Co., Inc. v. Pfizer Inc.,* 753 F.2d at 217. No factor alone is determinative, *ibid.,* and the ultimate test is the success plaintiff achieves in popularizing its mark. "The mere attempt to develop secondary meaning does not establish success; the public must first

concur." 3 Callman, Unfair Competition Trademarks and Monopolies § 1927, at 89.

Plaintiff claims that the term "Pan American" was used for forty years as its "primary corporate indicator" (Plaintiff's Post-Trial Brief, p. 4); that "as a result of the long, extensive and exclusive use and promotion thereof, [its] names and marks have achieved widespread public recognition and immediate association with Plaintiff" (Plaintiff's Pre-Trial Brief, p. 17); and that it "has extensively advertised its diverse services ... in virtually every available medium...." (*id.*, at 5). Plaintiff claims that in 1985, it budgeted over $35 million for domestic advertising, with $20,000 for its travel agent training services alone. Its annual sales exceed $3.5 billion.

■ These conclusory allegations and statistics do not establish secondary meaning. The focus is not so much the extent of plaintiff's efforts in advertising, sales and use of its marks, but the success of those efforts to popularize the marks. Plaintiff did not provide any evidence that the public has come to associate the words "Pan American" as a mark identifying plaintiff. Although a public survey is not necessary to establish secondary meaning and is only one factor to consider, the absence of one here is damaging to plaintiff. Plaintiff has offered nothing but its own conclusion that "[its] marks have achieved ... immediate association with Plaintiff". While that may be true with respect to the marks "Pan Am" and "Pan American World Airways", there is no indication that it is true with respect to the words "Pan American". Moreover, from the scant use of the mark "Pan American" and the pervasive and prominent use of "Pan Am", it appears that plaintiff's extensive advertising "in virtually every available medium" and attendant large expenditures exploit its name "Pan Am", not "Pan American". There is no sufficient showing that the mark "Pan American" has attained secondary meaning. That mark remains weak.

## (2) Similarity Between the Marks

In determining similarity between the marks in question, the focus is "the gener-al impression conveyed by the two marks", *McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d at 1134, and similarity is only relevant insofar as it causes confusion in prospective purchasers. *Ibid.* "Even close similarity between two marks is not dispositive of the issue of likelihood of confusion. [citation omitted] Rather, the similarity must be assessed in terms of its effect upon prospective purchasers". *Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d at 257.

Although there was a greater likelihood of, confusion while defendant used the globe and airplane logo, it has ceased use of that logo, albeit tardily. The logo is not part of defendant's name or mark for the present purpose of assessing similarity.

Defendant uses its full official name "Panamerican School of Travel" in its advertising, on its course materials and when it answers its telephone. Thus the comparison is between defendant's full name and plaintiff's mark "Pan American". That is not inappropriate, since the name of plaintiff's equivalent program is so different ("Pan Am International Travel Agents Training").

■ There are four significant differences between plaintiff's mark "Pan American" and defendant's mark "Panamerican School of Travel", which reduce the possibility of confusion. First, plaintiff's name is two words: Pan American. Defendant's name is one word: Panamerican, and it is spelled with a lower case "a". Defendant's name is listed as two words in the white pages of the telephone directory; however, defendant did not instruct the phone company to list its name in that form, *see* tr. 69, and all other evidence indicates that defendant's name is one word. *See, for example,* Exh. 84 (subway posters); Exh. 87 (newspaper ads); Exh. 90 (defendant's class schedules); and Exhs. 93 and 100 (course materials).

Second, defendant consistently uses the logo "PST" with its name. *See* Exhs. 84 (subway advertisement), 85 and 104 (New

York Post ads), 90, 91, 98, 99, 100 (course materials). Although in Exh. 103 (Daily News classified ad) PST is not printed with defendant's name, Mr. Martinez explained that when he instructed the Daily News to delete the globe logo, they mistakenly deleted defendant's PST logo as well, that this ad was subsequently corrected (tr. 58), and that defendant always uses PST in connection with its trade name. *Id.*, at 67–8.

Third, the type face of the two marks differs. Plaintiff's advertisements use a distinct lettering style. *See id.*, at 28 and Exh. 13 (representative of style). Moreover, plaintiff uses a standard light blue color in color ads. *Ibid.*

Finally, the parties' advertisements each have a distinct appearance. Defendant places 150–line ads, often enclosed in a two-by-three inch box, in the "classified" section of the newspaper. Plaintiff's ads typically cover ⅓ page or more and are sometimes in color. All of plaintiff's ads refer to it as "Pan Am" or, occasionally, as "Pan American World Airways", but never as "Pan American". They appear in the "travel" section.

(3) Proximity of the Products

The parties' services are related but noncompetitive. Both are connected to the travel industry, but defendant's services consist only of its travel agent training school. That service is to be compared with plaintiff's corresponding training program.

■ Product proximity turns on the nature of the products themselves, and the relevant markets to which they are directed. Plaintiff contends, since the courses taught at both schools cover the same subject matter and teach the same skills, and the graduates of both schools seek employment with travel agencies and tour operators, that "there can be no dispute that the services themselves are closely similar". Plaintiff's Post-Trial Brief, p. 11. Again, while there is some similarity between these services, it is "relevant only insofar as it bears on the likelihood of confusion

and gives the impression noncompeting goods are from the same origin". *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d at 1008; *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d at 1134.

■ Plaintiff argues that both parties' training services are offered to the same "public", that is, "neither party has the 'general public' as its market. Rather, both seek to attract those members of the general public who are interested in a career as travel agents or airline ticketing clerks." Plaintiff's Post-Trial Brief, p. 12. The characterization is too general.

Plaintiff's advertisements for its training program are directed to a limited field: it distributes brochures describing its program to its sales offices around the world, which in turn distribute them to travel agents. Thus, those who enroll in plaintiff's entry level courses (requiring no previous travel education) are "typically" people who have already been hired by travel agencies. Tr. 44.

Defendant's program, on the other hand, is directed to the "general public" and not particularly to those specifically interested in the travel industry. Defendant advertises its school in the classified ad sections of the Daily News and New York Post, on one Spanish-speaking radio station and on subway posters. Those who respond are primarily interested in getting a job, and the prospect of becoming a travel agent appeals to them. Defendant's school offers a resumé-writing workshop, and its students are encouraged to continue to contact the placement office after completion of the course, for possible employment opportunities.

Plaintiff's purpose in offering its educational services illuminates the difference between the segments of the public to which each is aimed. Plaintiff is primarily interested in generating a profit on its overall operations, and is willing to accept a loss on its training program since it hopes that travel agents will "leave with the idea of selling seats on Pan Am, and that's where we realize revenues in the training

program." Tr. 45. Plaintiff's training program is a "marketing tool." *Id.*, at 44. Defendant, on the other hand, has no other purpose or source of revenue than training individuals interested in obtaining employment as travel agents.

The names of the schools are easily distinguishable. Plaintiff's program is known to travel agents as Pan Am International Travel Agent Training. Defendant's school is Panamerican School of Travel. There is no proof of any confusion among travel agency employees (plaintiff's primary market) between the two schools.

**(4) Likelihood that Plaintiff will "Bridge the Gap"**

The likelihood that plaintiff will begin to operate a travel school directed to defendant's clientele is minimal, especially in light of the purpose behind plaintiff's training program. Plaintiff offered no evidence of any indication to do so. Plaintiff's position is that there is no gap between the parties' services because they cover the same subject matter, and even if they are directed towards the different segments of the public, prospective students and employees would simply assume plaintiff, well-known in the travel industry, had expanded its services to a larger market. For the reasons stated above, I do not agree.

**(5) Actual Confusion**

"No evidence of actual confusion is required in order to prove a likelihood of confusion." *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1024 (7th Cir.), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1979). However, since plaintiff's mark is weak, such evidence would aid plaintiff in demonstrating that the public is likely to be confused as to the source or sponsorship of defendant's service.

As evidence of actual confusion, plaintiff introduced testimony of three former students of defendant who were allegedly confused (as a result of defendant's advertising) as to the "sponsor" of defend-

ant's school. This evidence is not sufficient to establish likelihood of confusion.

There is no apparent indication as to the nature or scope of plaintiff's efforts to produce this testimony, i.e., no evidence as to how many students were contacted or what questions were asked. This is especially significant since all three students testified that they were unable to obtain jobs in the travel field and were dissatisfied with the quality of defendant's services. None of these students alerted plaintiff as to their confusion until contacted by plaintiff for purposes of this trial.

The testimony from these three witnesses is insignificant in light of defendant's total enrollment of 8200 students. "It is important to remember that the Lanham Act is concerned with confusion among *consumers*. Plaintiffs must prove that 'an appreciable number of reasonable consumers' would be confused as to source by defendant['s] title." *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. at 386; *see also Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d at 1175 (trademark owner need not prove junior user's conduct will mislead all customers, but only that it is likely to mislead many customers). Plaintiff has demonstrated only that three former students initially connected defendant's services with plaintiff. "Ownership of a trademark does not guarantee total absence of confusion in the marketplace. Selection of a mark with a common surname [Scott] naturally entails a risk of some uncertainty and the law will not assure absolute protection." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir.1978). Panamerican is a common word and in adopting that name for its business plaintiff took the risk that the name would be used by others.

Most significant in evaluating the students' testimony, however, is that defendant was still using the globe logo design when each of these students first learned of defendant. Each of three witnesses testified that they were aware of the "globe" logo design. Since the use of the globe logo markedly increased the possibility of

confusion, and since it is no longer used by defendant, these witnesses' testimony of confusion relates to a state of facts which no longer exists and therefore has little materiality to the present case.

**(6) Defendant's Intent**

██ In trademark infringement actions this factor looks to whether the defendant deliberately copied the plaintiff's mark in an effort to pass his services off as those of the plaintiff. *See Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. at 394. I do not find that here.

Defendant's name is the direct translation of its original Spanish name, Esuela Panamericana de Viajes. Its school was originally directed to the Spanish-speaking community centered in Washington Heights, New York City, New York. When defendant in 1982 decided to expand its market to encompass English-speaking students as well, it simply translated its Spanish name to English.

The term Panamerican is geographically descriptive of defendant's scope: it teaches Spanish and English students, and its instructors are both Spanish and English.

The fact that defendant was aware of plaintiff and its marks at the time it translated its name in 1982 is not evidence of bad faith. *See Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d at 48. Although defendant did not check registrations to see if "Pan American" was available for use, such a search would have been in vain since plaintiff has not registered its mark "Pan American". Indeed, as Judge Learned Hand observed, "[a]lthough there appears to be a persistent belief that the first use of a specific name or description gives a power to the first user to prevent its use by others, it is important to remember that no such doctrine exists." *Federal Telephone & Radio Corp. v. Federal Television Corp.*, 180 F.2d 250, 251 (2d Cir.1950).

Defendant's use of the globe and airplane logo, obviously similar to plaintiff's, is considerably more troublesome. In light of its awareness of plaintiff's marks at the time, defendant's claimed reliance on its designer's assurances that "they were different" seems disingenuous, and it is impossible not to suspect that defendant hoped some benefit would accrue to it by use of that logo in conjunction with its name. Nevertheless, in view of its later abandonment of that logo (although under coercion), I do not regard that aspect as decisive against the defendant under the present circumstances.

**(7) Quality of Defendant's Services**

This factor is not entitled to much weight here, absent other showing of likelihood of confusion, since the services at issue are substantially noncompeting. Even the three of defendant's former students who were not satisfied with the quality of its course, testified that their opinion of the plaintiff was not altered by that dissatisfaction with defendant.

**(8) Sophistication of the Buyers**

In determining likelihood of confusion, the court should consider the level of sophistication of the relevant purchasers. *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d at 1137. Here there are two groups of relevant purchasers: students, and prospective employers of the students.

The first group is difficult to assess. Since defendant's course costs $895, prospective students might pay particular attention to the identity of the sponsor, because "[t]he greater the value of an article the more careful the typical consumer can be expected to be". *Ibid.* On the other hand, since defendant's students are inexperienced in the travel field and primarily interested in obtaining employment, they might, as plaintiff suggests, attribute defendant's services to plaintiff, which is well-known in the travel industry. Yet, these same characteristics might suggest that the students also do not place much reliance on the tradename at all. The point is left to speculation, since no student who attended defendant's school after its discontinuance of the globe logo testified.

The second group must be considered fairly sophisticated. Employers of travel agents are most likely aware of the various programs provided by the major airlines. In fact, plaintiff stated that most travel agents know its program by its name, Pan Am International Travel Agent Training. Agencies hiring even entry level agents will consider the prospective employee's background, education or training. Plaintiff has offered no evidence of confusion on the part of any employers.

Balancing the Equities

Balancing the above factors clearly favors defendant's right to continued use of its mark "Panamerican School of Travel". With such a weak mark and little likelihood of confusion among consumers, the equities also favor defendant. Plaintiff has not demonstrated more than minimal prior use of the words. No benefit would accrue to plaintiff if defendant is enjoined from use of its name, while significant harm would result to defendant. Defendant has developed a moderately successful travel school operation without injury to plaintiff, and should not be prevented from continuing under its selected name.

Unfair Competition and Dilution

■ Plaintiff makes two state law claims, unfair competition and dilution of its mark. New York unfair competition law prohibits both attempts by one party to "pass off" his goods as those of another, and "a broader range of unfair trade practices generally described as the misappropriation of the skill, expenditures and labors of another." *Ideal Toy Corp. v. Kenner Products, Etc.*, 443 F.Supp. 291, 305 (S.D.N.Y.1977); *Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774, 781 (2d Cir.1964), *cert. denied*, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965). While proof of secondary meaning is not necessary for protection under the common law of unfair competition, *see ibid.*, the crucial inquiry for such a claim is the same as that for a § 43(a) Lanham Act claim: the likelihood that the public will be confused as to the source of defendant's product. *See Ideal Toy Corp. v. Kenner Products, Etc.*,

443 F.Supp. at 309; *see also American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655 (2d Cir.1979).

The parties' marks have been examined in detail above and no extended discussion is necessary here. For the reasons stated, defendant has not violated the New York unfair competition law.

■ New York's anti-dilution statute, N.Y.Gen.Bus.Law § 368–d (McKinney 1968), affords protection for a plaintiff's mark beyond that provided by infringement and unfair competition law. *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1165 (N.Y.1977). To be entitled to relief, plaintiff need not show a likelihood of confusion or even competition between its product and defendant's. *Id.*, 399 N.Y.S. at 631, 369 N.E.2d at 1165; *see Warner Brothers v. American Broadcasting Companies*, 720 F.2d 231, 248 (2d Cir.1983). The purpose of the statute is to prevent "the gradual whittling away of a firm's distinctive trade-mark [sic] or name", *Allied Maintenance v. Allied Mechanical*, 399 N.Y.S.2d at 632, 369 N.E.2d at 1165, even where an action for infringement or unfair competition may not be appropriate. However, although "an anti-dilution claim may be established in the absence of likely confusion as to source, there must be a mark of sufficient distinction to warrant the statute's special protection and there must be a blurring or tarnishing of the plaintiff's mark sufficient to constitute dilution." *Warner Brothers v. American Broadcasting Companies*, 720 F.2d at 248.

The Court of Appeals for the Second Circuit recently established a test to determine whether a plaintiff is entitled to § 368–d protection. *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624–26 (2d Cir.1983). The plaintiff must show (1) a distinctive mark, or one that has acquired secondary meaning; (2) a likelihood of dilution, using either a "tarnishing" theory or "blurring" theory; and (3) predatory intent of the defendant. *Id.; see P.F. Cosme-*

*tique, S.A. v. Minnetonka Inc.,* 605 F.Supp. 662, 672–73 (S.D.N.Y.1985).

As the discussion above shows, plaintiff's mark "Pan American" is not sufficiently distinctive to warrant protection under this statute. While the marks "Pan Am" and "Pan American World Airways" are distinctive to plaintiff, plaintiff has failed to show the likelihood of their dilution or tarnishing. Accordingly, plaintiff's claim for relief under this statute is denied.

## CONCLUSION

For the reasons discussed above, defendant has not infringed plaintiff's trademark rights nor has it violated New York unfair competition law or its anti-dilution statute.

The complaint will be dismissed and judgment entered for the defendant.